# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**CIPRIANO GONGORA,**

      **Petitioner,**

**v.**                           **Case No.: 3:14cv651-LC/CAS**

**SECRETARY, FLORIDA**
**DEPARTMENT OF CORRECTIONS,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

Petitioner Cipriano Gongora, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on December 3, 2014, alleging five grounds for relief. ECF No. 1. On May 17, 2015, Respondent filed an answer with exhibits. ECF No. 9. Petitioner filed a reply on August 18, 2015. ECF No. 12.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration of all the issues raised, the undersigned has determined that, for the reasons stated herein, the section 2254 petition (ECF No. 1) should be denied.

## Background and Procedural History

On January 7, 2010, Petitioner was charged by amended information in Florida's First Judicial Circuit with three counts related to a conspiracy between Petitioner and several co-defendants to smuggle cocaine from San Antonio, Texas, to Pensacola, Florida, between August 10, 2006, and September 7, 2006.  Ex. A at 10.[1]  Count I of the amended information charged Petitioner with conspiracy to sell, purchase, manufacture, deliver, bring into the State of Florida, or have actual or constructive possession of 400 grams or more, but less than 150 kilograms, of cocaine or a mixture containing cocaine, in violation of sections 777.04(3), 893.03(2)(a)(4), 893.135(1)(b)(1)(c), Florida Statutes.  *Id.* Count II charged Petitioner with selling, purchasing, manufacturing, delivering, bringing into the state, or having actual or constructive possession of that amount of cocaine or a mixture containing cocaine, in violation of sections 893.03(2)(a)(4) and 893.135(1)(b)(1)(c), Florida Statutes.  *Id.*  Count III charged Petitioner with failing to appear for court in violation of section 843.15(1)(a), Florida Statutes.

---

[1] Hereinafter, all citations to the state court record, "Ex.–," refer to exhibits submitted with Respondent's answer.  *See* ECF No. 9.

Petitioner pled guilty to Count III, and was convicted on Counts I and II on March 25, 2010, after a jury trial.  Ex. B at 228; Ex. N. at 31.  He was sentenced to two concurrent 30-year prison terms on Counts I and II, with a mandatory minimum of 15 years applied to both counts pursuant to section 893.135(1), Florida Statutes.  *Id.* at 240-42.  Petitioner was also sentenced to 5 years in prison on Count III with no credit given, to run consecutively to the sentences imposed for Counts I and II.  *Id.* at 241.  Petitioner's total sentence is 35 years in prison.

Petitioner appealed his conviction and sentence to Florida's First District Court of Appeal ("DCA"), raising four issues on appeal.  Ex. J. Specifically, Petitioner argued (1) that the trial court abused its discretion in denying Petitioner's motions for mistrial "following the trial court's repeated open rebuke of defense counsel in the presence of the jury," *id.* at 33; (2) that the trial court's denial of Petitioner's request for a jury instruction on Petitioner's "go-between" theory of defense was erroneous, *id.* at 34; (3) that the evidence at trial was insufficient to support Petitioner's conviction, and the trial court erred in denying Petitioner's motion for judgment of acquittal, *id.* at 35-36; and (4) that the trial court erred in denying

Petitioner's motion to suppress wiretap evidence.[2]  *Id.* at 36.  The First DCA

affirmed Petitioner's conviction and sentence per curiam on June 16, 2011.

Gongora v. State, 65 So. 3d 1057 (Fla. 1st DCA 2011) (table); Ex. M at 1.

Florida law provides that when a district court of appeal affirms a

lower court's ruling per curiam without opinion, the district court's ruling

bars further discretionary review by the Supreme Court of Florida.  *See*

Jackson v. State, 926 So. 2d 1262, 1265 (Fla. 2006).  Therefore,

Petitioner's conviction and sentence became final on November 7, 2011,

when the time to file a petition for writ of certiorari in the United States

Supreme Court expired.  *See* Bond v. Moore, 309 F.3d 770, 773-74 (11th

Cir. 2002) (explaining that a judgment becomes final either when the United

States Supreme Court issues a decision on the merits or denies certiorari,

or when the time for filing a petition for certiorari expires).

On December 29, 2011, Petitioner, through counsel,[3] filed a motion

for post-conviction relief in Florida's First Judicial Circuit pursuant to Florida

Rule of Criminal Procedure 3.850 ("Rule 3.850").  Ex. N at 46-64.  In his

---

[2] In his motion to suppress, Petitioner contended that the wiretaps violated applicable Florida privacy law, that officers had not exhausted other reasonable investigative options before seeking wiretap authorization, and that the warrants authorizing the wiretaps were issued without probable cause.  Ex. A at 78-90.

[3] At trial, Petitioner was represented by Leo Thomas, a criminal defense attorney in private practice.  *See, e.g.*, Ex. B at 193.  Ross A. Keane, also in private practice, represented Petitioner during his direct appeal and state post-conviction litigation.  *See, e.g.* Ex. N at 64.

Rule 3.850 motion, Petitioner alleged two grounds for relief: first, that trial counsel's failure to convey before trial a favorable plea offer of 20 years in prison was ineffective assistance of counsel, *id.* at 48; and second, that trial counsel rendered ineffective assistance by failing to impeach Petitioner's co-defendant Rene Elizondo, who testified for the State. *Id.* at 52. The state court struck Ground II of Petitioner's Rule 3.850 motion without prejudice, and Petitioner declined to amend it. Ex. O at 269. After an evidentiary hearing, the state court denied Petitioner's remaining claim for relief on the merits on July 30, 2013. *Id.* at 269-74. The First DCA affirmed the state court's ruling per curiam without opinion on May 15, 2014. Gongora v. State, 139 So. 3d 303 (Fla. 1st DCA 2014) (table). Judge Thomas dissented without opinion. *Id.*

Petitioner filed the instant section 2254 petition in this Court on December 3, 2014, raising five grounds for relief. ECF No. 1. In Ground One, Petitioner claims that the trial court abused its discretion in denying his motions for mistrial after the trial court rebuked Petitioner's trial counsel in the presence of the jury. *Id.* at 4. In Ground Two, Petitioner asserts that "the trial court committed error when it denied the Petitioner's request for a 'go-between' theory of defense [jury] instruction." *Id.* at 15. In Ground Three, Petitioner contends that the trial court erred by denying Petitioner's

motion for judgment of acquittal on Counts I and II, and that the evidence presented at trial was insufficient to sustain his conviction. *Id.* at 19. In Ground Four, Petitioner argues that the trial court erred in denying Petitioner's motion to suppress wiretap evidence. *Id.* at 22. In Ground Five, Petitioner alleges that the trial court's denial of Ground I of his Rule 3.850 motion was inconsistent with United States Supreme Court precedent. *Id.* at 26.

Respondent asks the Court to find that Grounds One, Two, and Three of the petition are procedurally barred and unexhausted, and that Petitioner fails to present a federal question. ECF No. 9 at 3-11. Respondent argues that Ground Four of the petition was waived or abandoned on direct appeal, and also that Ground Four is not cognizable in federal habeas. *Id.* at 11-13. Respondent asks this Court to deny Ground Five of the petition on the merits. *Id.* at 13-20.

## Analysis

Federal courts have limited authority to entertain petitions for writs of habeas corpus made pursuant to the judgments of state courts. Federal courts may consider such petitions "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (2017). Federal courts must deny section

2254 petitions unless the petitioner "has exhausted the remedies available in the courts of the State" holding the petitioner in custody, except in case of actual or constructive failure by the state to provide corrective process for the petitioner to exhaust. *Id.* at § 2254(b)(1). Courts may not deem the exhaustion requirement waived unless the state expressly waives it through counsel. *Id.* at § 2254(b)(3). A section 2254 petition which contains both exhausted and unexhausted claims—known as a "mixed petition"—must be dismissed entirely. *See* Rose v. Lundy, 455 U.S. 509, 518-20 (1982) (discussing the exhaustion requirement and its purposes).

Assuming a petitioner has exhausted the claims in state court, the petition "shall not be granted with respect to any claim that was adjudicated on the merits in State court" unless the adjudication of that particular claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. §§ 2254(d)-(d)(1) (2017). If the petition challenges the state court's determinations of fact rather than its conclusions of law, the federal court shall deny the petition unless the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). "[A] determination of a factual issue made by a State court shall be

presumed to be correct" unless the petitioner rebuts that presumption by clear and convincing evidence. *Id.* at § 2254(e)(1). Federal habeas courts also may not hold an evidentiary hearing unless the claim relies on a new, retroactive constitutional rule, or on "a factual predicate that could not have been previously discovered through the exercise of due diligence," and unless the petitioner can also show by clear and convincing evidence that, had the claimed constitutional error not occurred, "no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. §§ 2254(d)(2)-(2)(B).

**Ground One: Denial of Petitioner's Motions for Mistrial**

Petitioner's defense at trial centered on the allegation that Petitioner had conspired only to possess, transport, and sell large amounts of marijuana; that he was unaware any cocaine was involved; and that his involvement was limited to acting as a "go-between" in the transaction. Ex. C at 90-96. Petitioner also relied on a necessity defense, arguing that his co-conspirator, Rene Elizondo, was the mastermind of the conspiracy and "a very dangerous man" who threatened to harm Petitioner and his family unless Petitioner assisted in the conspiracy. *Id.* Accordingly, Petitioner's strategy at trial relied on successful impeachment of the State's witnesses, including Elizondo, with evidence of their prior criminal activity, and on

introducing evidence of Elizondo's reputation as a dangerous drug smuggler.

Circuit Judge Frank Bell presided over Petitioner's trial. Ex. C. Petitioner was represented by Leo Thomas. *Id.* The record of Petitioner's trial reflects several exchanges between Judge Bell and Thomas, both in response to objections by the prosecutor and by the trial judge *sua sponte*, in which Judge Bell criticized Thomas or instructed him to proceed a certain way with his examination of a witness. Petitioner identifies several comments by Judge Bell which Petitioner contends resulted in unfair prejudice to him at trial. ECF No. 1 at 7. On cross-examination, Thomas attempted to impeach Elizondo with prior statements about his involvement in other cocaine deals. The prosecutor objected that the testimony was irrelevant, to which Thomas responded in front of the jury:

> MR. THOMAS: It's related to his [Elizondo's] dealing in cocaine, which is the whole reason we're here.
>
> MR. ROBINSON:[4] Judge, object to that.
>
> THE COURT: Right. Do you want to be sworn as a witness, Mr. Thomas, if you are going to testify? You've either got to be a lawyer or a witness. You can't sit there and testify and make statements.

---

[4] The Hon. Coleman Lee Robinson was appointed to the First Judicial Circuit as a circuit judge in 2015. While an Assistant State Attorney, he represented the State of Florida at Petitioner's trial.

> MR. THOMAS:  Well, you are taking the objections
> here and - -
>
> THE COURT: He has a right to make an objection.
>
> MR. THOMAS: Well, do I have a right to answer?
>
> THE COURT: You don't have a right to testify.
>
> MR. THOMAS: Well, I'm asking.
>
> THE COURT: That's why we're here.
>
> MR. THOMAS: Can we approach the bench to deal
> with that?
>
> THE COURT: Anything else?
>
> MR. THOMAS: Can we approach the bench?
>
> THE COURT: I'm going to overrule the objection.

Ex. C at 154-55.  Later, when Thomas attempted to offer the title certificate

of Elizondo's truck into evidence, the prosecutor objected that the

document had not been authenticated.  *Id.* at 172-73.  Thomas responded:

> MR. THOMAS: These are documents
> furnished to me by the State.
>
> MR. ROBINSON: Objection.  That's irrelevant.
>
> MR. THOMAS: But it's not irrelevant that - -
> that they were furnished by the State, and I
> wouldn't think they would give me phony
> documents.  The State acts in good faith and
> they have to.  Those are documents seized
> from the truck.  He knows it and he knows it.

THE COURT: Why don't you ask him
[Elizondo] that?

MR. THOMAS: Well, you see what kind of a
witness he is.

MR. ROBINSON: Objection, Your Honor.

THE COURT: What you need to do is ask him
questions and don't make statements, Mr.
Thomas.

MR. THOMAS: Well, I did, but he's objecting,
Judge.

THE COURT: No, sir. When you are directing
things to me about you see what kind of a
witness he is, sir, then what you are doing is
testifying . . . .

*Id.* at 173. Thomas then asked for a sidebar, and moved for a mistrial

"because of the Court's admonishment here in the presence of the jury,"

which Thomas argued prejudiced Petitioner. *Id.* at 175. In the sidebar,

Judge Bell told Thomas that, in his opinion, "when the Court makes a ruling

either you don't understand it . . . or you are disregarding it, one of the two.

I would like to think it is that you don't understand it," and that "the only

way, sir, that I am going to get your attention is to tell you don't do it. Don't

do it." *Id.* at 175-76. Thomas did not argue with Judge Bell, but repeated

his request that any such instruction by the court be done outside the

presence of the jury. *Id.* at 176.

In further cross-examination of Elizondo, Thomas interrupted one of

Elizondo's answers with another question, prompting the following

exchange before the jury:

> THE COURT: Sir, if you're going to ask him a
> question, give him a chance to answer.
>
> MR. THOMAS: He answered.  He said the
> truth doesn't change.
>
> THE COURT: Give him a chance to fully
> answer the question.  Then you can ask
> another question.
>
> MR. THOMAS: Yes sir.
>
> THE COURT: That's the way it is.  It's not
> complicated.  We do that in every trial.

Ex. D at 228.  Petitioner argues that "[t]hese statements clearly resulted in

two damaging consequences: first, [they] undermined any actual

impeachment that counsel had achieved up to that point; second, [the] trial

court's statements served to undermine the jury's assessment of the

performance of [Petitioner's] counsel."  ECF No. 1 at 7.  The effect of these

statements, Petitioner contends, "was to lead the jury to believe that the

witness'[s] prior statement was not inconsistent or material.  Moreover, the

trial court's obvious disdain for [Thomas] resulted in the trial court making

openly derisive and sarcastic statements that clearly prejudiced

[Petitioner]."  *Id.* at 5.  Petitioner also argues that, even though further

disputes between Thomas and Judge Bell were resolved in bench conferences, this also resulted in unfair prejudice to Petitioner because, although the jurors could not hear the bench conferences, they could see them taking place. *Id.* at 9.

Respondent argues that Petitioner has failed to exhaust available state remedies with respect to Ground One, because Petitioner's "failure to advance a federal claim on [direct] appeal constitutes lack of fair presentation" of the federal question to the state court. ECF No. 9 at 3. Petitioner raised the issue in Ground One on direct appeal.[5] Because this issue was preserved at trial and raised on direct appeal, Petitioner could not raise it in his Rule 3.850 motion. *See* Fla. R. Crim. P. 3.850(c) (providing relief is not available "based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence"). The sole issue is whether Petitioner's presentation of his federal claims to the respective state courts was adequate to afford those courts a fair chance to rule on those claims.

The requirement that a prisoner exhaust state remedies before filing a federal habeas petition "is designed to give the state courts a full and fair

---

[5] Ground I of Petitioner's section 2254 petition is for the most part a word-for-word reproduction of the first section of Petitioner's initial brief on direct appeal. *See* ECF No. 1 at 4-14; *c.f.* Ex. J at 38-53.

opportunity to resolve federal constitutional claims before those claims are presented to federal courts," thus "reduc[ing] friction between the state and federal court systems."  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). A federal court may not grant habeas relief to a state prisoner unless that prisoner has first exhausted the remedies available in the state courts whose judgments hold the prisoner in custody.  28 U.S.C. § 2254(b)(1).[6] "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court," otherwise the federal court may not grant relief.  O'Sullivan, 526 U.S. at 842.  A prisoner has not given state courts a fair opportunity to adjudicate a federal claim if the state court "must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 32 (2004).  It is not sufficient for a state court to have had the opportunity to read other documents, such as court opinions, which make it clear that the prisoner's claims are based on federal law—the prisoner must present the federal claims to state courts as

---

[6] Although the Antiterrorism and Effective Death Penalty Act of 1996 made exhaustion a statutory requirement, that statute codifies a longstanding judicial doctrine.  *See* O'Sullivan, 526 U.S. at 842 (noting that the exhaustion requirement was first announced in 1886).

federal claims, not as state claims which align with federal law.  *See id.* at 29-34 (dismissing petition for failure to fairly present federal claims, although state trial court opinion explicitly rested on federal law).  This remains the case even if the unpresented federal claims are essentially the same as the state claims presented.  *See id.* at 34 (Stevens, J., dissenting) (noting that there was "no significant difference" between the petitioner's Oregon constitutional claims and his federal ones).

Because Petitioner could not have raised this claim in his Rule 3.850 motion, the Court's analysis must center on Petitioner's initial motion for mistrial and on his arguments on direct appeal.  Petitioner's oral motion for mistrial, as stated by Thomas, does not reference any legal authority, but only reflects Thomas's contention that Judge Bell's comments "prejudiced [his] client."  Ex. C at 174.  After trial, Petitioner renewed the motion in writing: the relevant portion of this motion relies entirely on Florida law and does not mention federal constitutional rights.  Ex. B at 181-83.  Petitioner's motion does mention Keane v. State, 357 So. 2d 457 (Fla. 4th DCA 1978), for the proposition that improper comment by a judge "deprived the defendants of a fair trial" in that case.  Ex. B at 182.  It is not clear from

Petitioner's motion whether the right to a fair trial in question is that conferred by the United States Constitution, or the Florida Constitution.[7]

On appeal, the First DCA did not hold oral argument on Petitioner's case, and therefore only Petitioner's initial and reply briefs on appeal are relevant. Petitioner's initial brief appears to rest entirely on Florida law: Petitioner cited twenty-four cases from Florida courts, and none from federal courts. *See* Ex. J at 38-53. Even Petitioner's lengthy quotations from Florida cases do not discuss points of federal law. *See*, *e.g.*, *id.* at 48 (citing <u>Simmons v. State</u>, 803 So. 2d 787, 789 (Fla. 1st DCA 2001)). In his brief, Petitioner asked the First DCA to grant relief because "[i]t is the settled *law of this State* that every litigant is entitled to nothing less than the cold neutrality of an impartial judge." *Id.* at 39 (emphasis added). Petitioner also relied on commentary on the Florida Evidence Code, and on Professor Ehrhardt's *Florida Evidence* treatise. *Id.* at 40.

A fair reading of the state court record leads to the conclusion that Petitioner did not fairly present his claims to the Florida courts in federal terms. Although Florida law is congruent with federal law in conferring the

---

[7] *See* U.S. Const. amend. VI (providing "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"); Fla. Const. art. 1 § 16(a) (providing "[i]n all criminal prosecutions the accused . . . shall have the right . . . to have a speedy and public trial by an impartial jury"); <u>Rolling v. State</u>, 695 So. 2d 278, 284 (Fla. 1997) (noting "the defendant's right, under the United States and Florida Constitutions, to a fair trial by an impartial jury").

right to a fair trial by an impartial jury, Petitioner's motion for mistrial and argument on appeal treat the claim as one of Florida constitutional and evidence law, without reference to Petitioner's corresponding federal constitutional rights. Ground One of the section 2254 petition is not distinguishable from Reese, and Petitioner's has therefore failed to exhaust Ground I of his petition as required by 28 U.S.C. § 2254(b).

Because it contains both exhausted and unexhausted claims, Petitioner's section 2254 petition is a "mixed petition." *See* Lundy, 455 U.S. at 510 (explaining that mixed petitions contain both exhausted and unexhausted claims). In Lundy, the Supreme Court held "that a district court must dismiss habeas petitions containing both unexhausted and exhausted claims." *Id.* at 522. This rule "furthers the policy of comity underlying the exhaustion doctrine" by giving state courts the first fair chance to correct their alleged constitutional errors. *Id.* at 513-14.

The Court's holding in Lundy assumed, however, that the prisoner had "the choice of returning to state court to litigate his unexhausted claims, or of proceeding with only his exhausted claims in federal court" by amending his petition to delete the unexhausted claims. *Id.* at 514. In the present case, Petitioner cannot return to state court to litigate his unexhausted claims on their federal basis, because any Rule 3.850 motion

Petitioner might file would be deemed untimely.  *See* Fla. R. Crim. P. 3.850(b) (providing that motions under the rule are untimely if filed more than two years after the judgment and sentence in question becomes final). Petitioner's Rule 3.850 filing window expired on November 7, 2013, two years after his conviction and sentence became final.  *See supra* at 4. Petitioner no longer has "the right under the law of the State to raise . . . the question presented."  28 U.S.C. § 2254(c).  When a petitioner has "failed to properly exhaust these claims in the state courts, and now is undeniably barred by firmly established and consistently applied state procedural rules from raising them, the claims are procedurally defaulted, and [federal] review is precluded by this adequate and independent state procedural ground."  Henderson v. Campbell, 353 F.3d 880, 891 (11th Cir. 2003) (footnote omitted).  Therefore, Ground One of the petition is subject to dismissal as procedurally defaulted.

Regardless of any procedural default, this claim lacks merit.  Courts have wide discretion to "preserve order" and "suppress disturbance" or disrespect for the court.  *See*, *e.g.*, Pounders v. Watson, 521 U.S 982, 987-88 (1997) (quoting Cooke v. United States, 267 U.S. 517, 534 (1925)). Corrective measures taken by courts can give rise to constitutional error, but only if the prisoner can establish that the error " 'had substantial and

injurious effect or influence in determining the jury's verdict.' " Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The error Petitioner alleges "may be quantitatively assessed in the context of other evidence presented in order the effect it had on the trial." Brecht, 507 U.S. at 629 (internal marks and citation omitted). It is a "trial error" which is subject to the "harmless error" standard of review. *Id.* Given the volume and significance of the evidence against Petitioner, *see* pp. 27-29 *infra* (discussing Petitioner's motion for judgment of acquittal), Petitioner has not demonstrated that any effect of Judge Bell's comments on the jury's determination would have been other than minimal and insubstantial. Therefore, the Court should deny relief on Ground One.

**Ground Two: Denial of Petitioner's "Go-Between" Jury Instruction**

At trial, Petitioner sought to convince the jury that he was merely a go-between linking Elizondo to potential buyers rather than a principal of the conspiracy. ECF No. 1 at 17. Petitioner contended that "although [Petitioner] may have brought the parties to the transaction together, there was no evidence presented that [Petitioner] could have personally carried through with the sale or could have forced Rene Elizondo to consummate

the sale." *Id.* Pursuant to this theory of the case, Petitioner requested the

following special jury instruction:

> If you find from the evidence that Cipriano Gongora
> was merely a go-between in a drug transaction then
> you should find him not guilty of the conspiracy
> charged in Count I. In other words, the State must
> prove beyond a reasonable doubt that Cipriano
> Gongora was not a mere go-between in a drug
> transaction.

Ex. N at 166. The trial court denied Petitioner's request and held that the

standard jury instructions were sufficient to inform the jury on this point.

Ex. E at 601. The court instructed the jury on the elements of the

conspiracy charge, Ex. N at 15-16, and gave the following instruction under

the heading "Principals":

> If the defendant helped another person or persons
> commit a crime, the defendant is a principal and
> must be treated as if he had done all the things the
> other person or persons did if:
>
> 1. the defendant had a conscious intent that the
>    criminal act be done and
> 2. the defendant did some act or said some word
>    which was intended to and which did incite,
>    cause, encourage, assist, or advise the other
>    person or persons to actually commit the crime.
>
> To be a principal, the defendant does not have to be
> present when the crime is committed.

*Id.* at 22-23.

Petitioner argues that the court erred both in denying his request for a special jury instruction and in giving the "Principals" instruction. ECF No. 1 at 15-18. Ground Two—like Ground One—is a near-verbatim repetition of Petitioner's initial brief on direct appeal with the addition of a claim that the rights asserted by Petitioner are guaranteed by "Florida precedent citing to United States Supreme Court precedent, and/or federal law." *Id.* at 16; *c.f.* Ex. J at 53-59. Respondent argues that Ground Two, like Ground One, should be dismissed due to procedural default because Petitioner did not fairly present his federal claims in state court. ECF No. 9 at 8. Respondent further argues that Petitioner fails to state a federal claim in Ground Two. *Id.* at 8-9. Finally, Respondent asks the Court to deny relief on the merits because Petitioner's requested instruction was "redundant or if not redundant, was confusing or misleading because it did not define 'go-between.' " *Id.* at 9-10.

As with Ground One, Petitioner could not have raised Ground Two in his Rule 3.850 motion, and the relevant record therefore consists of Petitioner's trial motions and arguments on appeal. *See* Fla. R. Crim. P. 3.850(c). A fair reading of the record makes it clear that Ground Two is barred by Petitioner's procedural default to the same extent as Ground One, and for the same reasons. Petitioner's initial brief cites eighteen

Florida cases but does not mention federal law. *See* Ex. J at 53-59.

Although the cases cited by Petitioner in his briefs may themselves rest on

federal law, this is not sufficient to qualify as a fair presentation of

Petitioner's federal claims. *See* Baldwin, 541 U.S. at 29-34 (holding that a

claim is not fairly presented where the state court must look beyond the

briefs to find the federal basis for that claim). Because Petitioner did not

fairly present his federal claims to Florida's courts, his claim is procedurally

defaulted and is subject to dismissal. *See* O'Sullivan, 526 U.S. at 842.

Regardless of the procedural default, Petitioner also fails to state a

claim under federal law for which habeas relief may be granted. *See* 28

U.S.C. § 2254(a) (providing that relief is available only to those "in custody

in violation of the Constitution or laws or treaties of the United States").

Petitioner's assertion that his rights secured by "Florida precedent citing to

United States Supreme Court precedent," ECF No. 1 at 16, were violated

can only be read as alleging an error under state law, not federal law—a

conclusion supported by the fact that Petitioner relies exclusively on Florida

cases in his petition. *See* Zeigler v. Crosby, 345 F.3d 1300, 1307 n.5 (11th

Cir. 2003) (providing that "[c]ursory and conclusional sentences

(unaccompanied by citations to federal law)" do not suffice to fairly present

a federal claim to state courts). Petitioner does not claim that the trial

court's failure to give the requested jury instruction " 'so infected the entire trial that the resulting conviction violate[d] due process.' " Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  Instead, Petitioner argues that the failure to give the requested instruction was inconsistent with Florida case law.  To the extent Petitioner could raise a colorable federal claim with respect to Ground Two, he has failed to do so.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  Estelle, 502 U.S. at 67-68.  See also Jamerson v. Sec'y for Dep't of Corr., 410 F.3d 682, 688 (11th Cir. 2005) (providing that "[a] jury instruction that 'was allegedly incorrect under state law is not a basis for habeas relief'") (citing Estelle, 502 U.S. at 71-72).  Therefore, regardless of any procedural default, Ground Two of the petition is not cognizable in this proceeding.

Even if the foregoing barriers to federal habeas review were absent, the claim is without merit.  Prisoners who pursue collateral attacks on jury instructions bear a heavier burden than similar claims on direct appeal, because they must establish that " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' . . . not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.' "  Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting

Cupp, 414 U.S. at 146-47) (internal marks omitted).  When the claimed

error is the failure to give a jury instruction rather than the actual giving of

an incorrect instruction, "the [prisoner's] burden is especially heavy."  *Id.* at

155.  The failure to give a jury instruction is less likely to result in prejudice

than an instruction which is actually given, but which misstates the law.  *Id.*

"The significance of the omission of such an instruction may be evaluated

by comparison with the instructions that were given."  *Id.* at 156.

Furthermore, Petitioner is only entitled to relief if the state court

adjudications on the merits of his claim were contrary to, or involved an

unreasonable interpretation of, clearly established federal law.  28 U.S.C.

§ 2254(d)(1).  As noted above, Petitioner does not identify any federal

law—whether "clearly established" within the meaning of section 2254 or

not—that was incorrectly or unreasonably applied by the state courts which

adjudicated his claims.

Moreover, the state courts' rulings are not contrary to Kibbe; nor do

they apply that rule in an unreasonable way.  State court decisions are

"contrary to [the Supreme Court's] clearly established precedent if the state

court applies a rule that contradicts the governing law set forth in [the

Supreme Court's] cases," or "if the state court confronts a set of facts that

are materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a different result from [Supreme Court] precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  The state court decisions
challenged by Petitioner are not contrary to Kibbe in any relevant sense.
While it is true that the state courts did not apply Kibbe at all, the state
courts' rulings on Petitioner's claims are nonetheless reasonable
interpretations of Kibbe.  Petitioner's requested jury instruction is redundant
when considered in light of the instruction actually given.  *See* Kibbe, 431
U.S. at 156 (instruction may be considered in comparison with those
actually given to the jury).  The jury was instructed that it could find
Petitioner guilty if he "had a conscious intent that the criminal act be done"
and "did some act or said some word which was intended to and which did
incite, cause, encourage, assist or advise the other person or persons to
actually commit the crime."  Ex. N at 22.  While Petitioner's requested
instruction could have further clarified the meaning of the word "assist," a
court could also reasonably conclude that it was improper to instruct the
jury on a "go-between" theory without also defining that phrase for the jury,
which Petitioner's requested instruction did not do.  Therefore, even on
consideration of the merits of Ground Two, Petitioner is not entitled to relief.

**Ground Three: Denial of Petitioner's Motion for Judgment of Acquittal**

In his third ground for relief, Petitioner alleges that "the trial court erred when it denied the Petitioner's motion for judgment of acquittal on the charge[s] of Narcotics Conspiracy and Trafficking" and that "trial evidence was also insufficient to sustain [Petitioner's] conviction for conspiracy and trafficking." ECF No. 1 at 19. Respondent asks the Court to dismiss this claim as procedurally defaulted on the same basis as Grounds One and Two.

Like Grounds One and Two, Ground Three of Petitioner's section 2254 petition is a reproduction of the corresponding portion of his initial brief on direct appeal, with the addition of a bare assertion of reliance on "Florida precedent citing to United States Supreme Court precedent." ECF No. 1 at 19-21; *c.f.* Ex. J at 59-61. Petitioner again relied exclusively on Florida law when raising this claim before Florida courts, without any reference to his federal constitutional rights. *See id.* In his brief on direct appeal, Petitioner argued that the prosecution had failed to prove the elements of the conspiracy and trafficking charges under Florida law. *Id.* at 60-61. For the reasons stated in the sections of this report and

recommendation discussing Grounds One and Two *supra*,[8] Ground Three is procedurally defaulted by Petitioner's failure to give Florida's state courts a fair opportunity to rule on his federal claims, to the extent Petitioner could raise such claims.

Even if a federal claim were properly presented to the state courts, the state courts' conclusion that the evidence presented in this case met the minimum threshold for conviction was reasonable.  The Fourteenth Amendment's Due Process Clause presumes "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316 (1979).  On collateral review, "the relevant question is whether, after viewing the evidence in the light most

---

[8] In Jackson v. Virginia, the Supreme Court commented that, under the logic of the Court's decision in In re Winship, 397 U.S. 358 (1970), "a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim."  443 U.S. 307, 321 (1979).  Although it has not been explicitly overruled, this directive in Jackson has been receded from in O'Sullivan, 526 U.S. at 842, and Baldwin, 542 U.S. at 29-34, which require a prisoner to specifically identify and state federal claims to avoid procedural default, rather than raising such claims by implication as Jackson would allow.  *Accord* Zeigler, 345 F.3d at 1307 n.5 ("State courts are decision makers.  They do not have to read imaginatively the arguments counsel put before them or to make new arguments for the parties").

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

The evidence against Petitioner satisfies the <u>Jackson</u> standard: a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. The trial record contains substantial evidence of Petitioner's guilt, including wiretap recordings of Petitioner's telephone calls in the course of the conspiracy and extensive testimony of Petitioner's co-defendants. At the evidentiary hearing on Petitioner's Rule 3.850 motion, Petitioner's trial counsel testified that, in his opinion, the evidence against Petitioner "was not strong. It was huge. It was great. I mean, it was beyond strong. I mean, with the wiretaps and the co-defendants . . . So it was - - it was extremely strong." Ex. O at 229. Given the evidence in favor of conviction, Petitioner's counsel testified that he "would have hit [Petitioner] over the head to get him to take [a favorable] plea." *Id.* at 231.

This is a fair characterization of the evidence against Petitioner. Elizondo testified that Petitioner arranged the cocaine deal at issue, and made most of the logistical arrangements involved in the sale. Ex. C at 117-30. He testified that Petitioner instructed him to cut one brick of cocaine in half in response to a request from the buyer, and that after the conclusion of the sale Petitioner instructed Elizondo and his other

accomplices to travel elsewhere in Florida to sell the remainder of their cocaine. *Id.* at 130-34. The jury also heard wiretap recordings of phone calls between Petitioner and the individuals to whom the cocaine was sold, discussing prices, arranging meetings, and coordinating the exchange. *See*, *e.g.*, Ex. D at 259-67, 269-77. Although the jury also heard evidence that Elizondo was a dangerous person who had a history of drug dealing and employing threats to ensure compliance, Ex. E at 416-22, 434-44, a rational trier of fact could conclude beyond a reasonable doubt that Petitioner committed the crimes of which he was convicted based on the evidence in the record. Therefore, for the foregoing reasons, Petitioner is not entitled to relief on Ground Three.

**Ground Four: Denial of Petitioner's Motion to Suppress**

In his fourth ground for relief, Petitioner asks the Court to order a new trial on the grounds that the wiretap used by law enforcement to gather evidence of drug transactions in this case was conducted pursuant to a warrant issued without probable cause. ECF No. 1 at 22-24. Petitioner also argues that the method used to conduct the wiretap violated applicable Florida privacy statutes, and that the search was therefore unreasonable. *Id.* Petitioner contends that "the trial court erred in allowing wiretap evidence and all wiretap-related telephone evidence should have been

suppressed.  Accordingly, this case should be retried."  *Id.* at 24.  Petitioner raised the denial of his motion to suppress the wiretap evidence on direct appeal, and it was affirmed per curiam without explanation.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures, and provides that "no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  Searches and seizures conducted without the authority of a warrant are presumed unreasonable, but "the ultimate touchstone of the Fourth Amendment is 'reasonableness'."  Brigham City v. Stuart, 547 U.S. 398, 403 (2006).  The Supreme Court crafted the exclusionary rule of Weeks v. United States, 232 U.S. 383 (1914), and Mapp v. Ohio, 367 U.S. 643 (1961), as "a judicially created means of effectuating the rights secured by the Fourth Amendment."  Stone v. Powell, 428 U.S. 465, 483 (1976).  The exclusionary rule is remedial—its focus is "preserving the integrity of the judicial process."  *Id.* at 486.  "It is not a personal constitutional right" and is "not calculated to redress the injury of the privacy of the victim of the search or seizure" but to deter unlawful conduct by police.  *Id.*

The Supreme Court concluded in Stone that these purposes are not served by allowing collateral review of Fourth Amendment claims, and held "that where the State has provided an opportunity for full and fair litigation

of a Fourth Amendment claim," habeas relief is not available "on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494.  Furthermore, to the extent Petitioner bases his argument on the violation of a Florida privacy statute, Petitioner fails to state claim that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Thus, no portion of Petitioner's Fourth Amendment claim is cognizable in federal habeas.

Even if the Fourth Amendment claim were not barred by Stone, the claim is without merit.  At the hearing on the motion to suppress, the only witness presented testified about the technical means of obtaining the wiretap information and the security of the information being obtained, not about the presence or absence of probable cause to issue the wiretap order in the first instance.  *See* Ex. G at 313-338.  On appeal to the state First District Court of Appeal, the State pointed out that the wiretap application and affidavit was not submitted to the trial court for its consideration in ruling on the motion to suppress.  Ex. K at 37.  Thus, the trial court had no factual basis on which to suppress the evidence as having been obtained based on a wiretap order issued without probable

cause, and the state courts' adjudications regarding the admission of the wiretap evidence were not therefore unreasonable.

Petitioner has failed to demonstrate that the state courts' adjudications of the Fourth Amendment issue were based on an unreasonable determination of the facts or that the adjudications resulted in a decision that was contrary to or an unreasonable application of clearly established Supreme Court precedent. For all the foregoing reasons, Petitioner is not entitled to federal habeas relief on Ground Four.

**Ground Five: Ineffective Assistance of Counsel**

In his fifth claim for relief, Petitioner argues that the state courts erred in denying his claim for ineffective assistance of counsel for failure to convey a favorable plea deal prior to trial. ECF No. 1 at 25. Petitioner asks the Court to order specific performance of the plea offer. *Id.* at 31. Respondent contends that Petitioner cannot satisfy the ineffective assistance standard because the record fails to show that he would have accepted the plea offer if had known about it. ECF No. 9 at 13-20.

The plea offer at issue would have recommended that the trial court sentence Petitioner to twenty years in prison pursuant to a fifteen-year

mandatory minimum, and a $100,000 fine,[9] which is 15 years less than the

sentence Petitioner ultimately received.  Ex. N at 83-87.  The cover sheet

of the plea offer reflects that the plea offer was faxed to Petitioner's counsel

on October 23, 2009, well in advance of Petitioner's trial.  *Id.* at 82.

Petitioner first raised this claim in his Rule 3.850 motion.  *Id.* at 48-52.  This

plea offer was never forwarded to Petitioner, and Petitioner's appellate and

post-conviction counsel did not obtain a copy until after the issuance of the

mandate on direct appeal, so Petitioner could not have raised it at an

earlier stage.  *Id.* at 49; *c.f.* Fla. R. Crim. P. 3.850(c) (barring review of

claims which could have been raised on direct review).

The state post-conviction court ordered Respondent to show cause

only with respect to Petitioner's claim of ineffective assistance for failure to

convey a plea, and Respondent conceded that an evidentiary hearing

would be necessary to resolve the issue.  Ex. N at 179-181.  The court

granted a hearing on the limited issue of Petitioner's ineffective assistance

claim, *id.* at 182, and the hearing was held before Judge Scott Duncan on

---

[9] By the terms of the plea offer, Petitioner would plead guilty to four charges: (1) conspiracy to traffic in cocaine in an amount greater than 400 grams but less than 150 kilograms; (2) actually trafficking in cocaine in that amount; (3) conspiracy to sell, manufacture, deliver, or possess with the intent to sell, manufacture, or deliver a controlled substance; and (4) felony failure to appear.  Ex. N at 83.  At the time, Petitioner was only charged with items 1, 2, and 4 in that list.  *See* Ex. A at 6-7 (amended information, filed October 4, 2009).

June 6, 2013.  Ex. O at 190.  The State stipulated that the plea offer was sent by fax to defense counsel Thomas on October 23, 2009, as indicated by the cover sheet.  *Id.* at 198-199.  Thomas testified that the first time he "noticed it was after [Petitioner] had been sentenced."  *Id.* at 224.  He said he did not recall personally receiving the offer and agreed he never conveyed the offer to Petitioner.  *Id.* at 225.  Thomas testified that had he been aware of the offer prior to trial, "I would have done everything in my power to get Mr. Gongora to agree to the plea offer.  And I felt like he was willing to do that based on a conversation I had with him, and based on a letter I wrote to [the prosecutor] back in July of 2009, which is sort of confidential, but I could submit it.  And it was a request to look at certain information and then to offer him something by way of a plea deal.  And I did that notwithstanding the fact that the first call I made when I got the case was to [the prosecutor], and he was adamant that there would be no deal because Mr. Gongora had been a fugitive and had run."  Ex. O at 225-26.

The court heard testimony from several other witnesses, including Petitioner, who testified that he had not seen the plea offer prior to his trial and that he never discussed the terms of it with his trial attorney.  *Id.* at 202.  When asked whether he would have accepted "this sentence

recommendation of 20 years without the benefit of going to trial," Petitioner

answered "Yes." *Id.* at 203.[10] Petitioner also stated that he would have

waived his trial rights in exchange for that sentence. *Id.* at 203-04.

On cross-examination, the prosecutor pursued a line of questioning

intending to show that Petitioner's enthusiasm for the 20-year plea deal

was the product of hindsight, and that Petitioner therefore would not have

accepted the deal when offered had he known of it. The prosecutor began

by inquiring about Petitioner's failure to appear, which Petitioner explained

as an attempt to provide substantial assistance to the government in the

hope of receiving "some kind of relief, some kind of help" at sentencing. *Id.*

at 205-07. Petitioner hired an attorney in Brownsville, Texas, to advise him

in his strategy to obtain a downward adjustment for substantial assistance,

but never discussed the matter with his trial counsel or asked his trial

counsel any questions about it. *Id.* at 209-11. The prosecutor then asked:

> Q: So when you found out they [Petitioner's co-
> defendants] were getting a year and three years, did
> you ever ask Mr. Thomas, well, can I get one of
> those?
>
> A: I want to, yes sir. That's why I gave them that
> information to the substantial assistance. That's

---

[10] On cross-examination, the prosecutor told Petitioner "you seem to hesitate quite a
while before you answered that question, that yes, you would have taken 20 years."
Ex. O at 205. The stenographic record of the hearing does not note a pause during
Petitioner's testimony, nor the length of any such pause.

why I gave - - I gave them that information, because those guys had said that I was the responsible party for - - that I was the guy, as they said on the record. And I said, that's not true, sir, I was used as a scapegoat.

Q: When you gave that information to Mr. Thomas, what did you tell him you were willing to take? What kind of plea were you looking for?

A: The same as them.

Q: So three years?

A: That's fine, if that's what they could give me, they could give me that.

Q: So, if they would have given you three years or a year, you would have jumped on that?

A: If it's the same as my co-defendants, yes, because we were all together.

Q: Right. So three or four years, you would have taken that in a heartbeat?

A: Correct.

Q: But not 20 years?

A: I don't know about no 20, sir.

Q: Would you have jumped on 20 years, with 15 of it day-for-day, every day, not getting out for over 15 years, close to 20?

A: Yes.

*Id.* at 212-13.  When asked whether he would have accepted a 20-year sentence before trial, without knowledge of the 35-year sentence that would eventually be imposed, Petitioner answered "I didn't know I had 20 years, sir," and then "I couldn't answer that, sir.  I can't answer that.  I don't know.  I would take anything better right now."  *Id.* at 214.  The prosecutor then asked:

> Q:  What is the maximum time you would have accepted [before trial]?
>
> A: The same of [sic] my co-defendants.  They testified against me, and I feel like they used me as a scapegoat.  We were driving in the same vehicle. I don't know why - -
>
> Q: When you say the same as your co-defendants, what is it you would have accepted at that point? What's the most you would have accepted at that point, before the trial?
>
> A: The same as them, three years.
>
> . . .
>
> Q: Okay.  So if Mr. Thomas had come to you before the trial - -
>
> A: What is - -
>
> Q: - - if he had come to you, your lawyer had come to you before the trial, and asked you, what do you want, what will you take, what would have been your answer?
>
> A: Three years.

Q: So if he had then said, well, the offer is 20, what would you have said?

A: I want three.

Q: If he said the offer is 20 or go to trial, what would you have done?

A: I would have - - would have talked to him first.

Q: What would you have done?

A: I don't know. I wasn't there at the time. I can't answer the question that wasn't asked to me at the time. It's a whole different subject now that I'm here.

*Id.* at 215-17.

The state post-conviction court denied Petitioner's Rule 3.850 motion. *Id.* at 269. The state court's order noted that Petitioner "noticeably hesitated in stating that he would have accepted the offer" of 20 years. *Id.* at 271. The state court emphasized Petitioner's indication that, before trial, "he was looking for a plea in the range of sentences he believed his co-defendants received" and that Petitioner "further equivocated" about whether he would have accepted a 20-year sentence or insisted upon a 3-year sentence instead. *Id.* at 271-72. The state court found that Petitioner's testimony was not credible, and that Petitioner had not established that he would have accepted the 20-year plea deal had it been

conveyed to him. *Id.* at 272. In support of this conclusion, the state court

relied on the internal inconsistencies in Petitioner's testimony, and the

conflict between his testimony and that of his trial counsel regarding

whether Petitioner had discussed possible penalties with his counsel. *Id.*

Petitioner appealed, and the First DCA affirmed the ruling per curiam

without opinion. Gongora v. State, 139 So. 3d 303 (2014) (table). Judge

Thomas dissented without opinion. *Id.*

In his section 2254 petition, Petitioner argues that "[a]lthough

[Petitioner] stated that prior to trial he would have liked a sentence

comparable to what the co-defendants received, considering his testimony

in the proper context, it is clear that he was not rejecting a 20[-]year offer."

ECF No. 1 at 27. "Despite the State's attempt to confuse [Petitioner]

regarding sentences received by testifying co-defendants," Petitioner

contends, ". . . [Petitioner] testified repeatedly that he would have accepted

the 20[-]year plea offer." *Id.* at 26. Petitioner asserts that he "was

consistent throughout the hearing, notwithstanding efforts by the State to

obfuscate the questioning in relation to co-defendant sentencing." *Id.* at 28.

Petitioner draws a distinction between the question of "what sentence he

would have *wanted* prior to trial and without any known plea offer being

made," and the question of "whether he would have rejected the 20[-]year offer had it been known." *Id.* at 30.

To prevail on a claim of ineffective assistance of counsel, a prisoner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment" and that "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial," which means "a trial whose result is reliable." *Id.* To satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. To satisfy the second prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Strickland test is applied by courts in deciding whether counsel's performance was constitutionally deficient. On federal habeas review of a state judgment, however, the issue is whether the state court's decision on

the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or whether it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254 (2017). This standard of review is "'difficult to meet'" and "'highly deferential'" to the state court's conclusions of law. Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). A federal court may not grant relief "in cases where a state court's error is limited to the manner in which it *applies* Supreme Court precedent." Williams, 529 U.S. at 407. Rather, a state court decision is contrary to clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a different result" from that reached by the Supreme Court in its precedent. *Id.* at 405-06. A federal court may grant relief if the state court's adjudication applies the correct federal law, but does so in an objectively unreasonable way. *Id.* at 409-410. However, "a federal court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411; *see also* Frazier v. Bouchard, 661 F.3d 519, 530-31 (11th Cir. 2011) (discussing prongs of § 2254(d)(1)).

Petitioner and Respondent disagree on whether the state courts applied the correct standard when adjudicating Petitioner's claims. Petitioner contends that the state post-conviction court applied the three-element analysis from Cottle v. State, 733 So. 2d 963, 966 (Fla. 1999), and not the five-element test of Alcorn v. State, 121 So. 3d 419, 428 (Fla. 2013), which receded from Cottle and implemented the holdings in Missouri v. Frye, 566 U.S. 133 (2012), and Lafler v. Cooper, 566 U.S. 156 (2012). Respondent notes that the Florida Supreme Court decided Alcorn in the time after Petitioner's evidentiary hearing but before the state post-conviction court issued its order on Petitioner's Rule 3.850 motion, but argues that "[t]his circumstance does not matter" because Petitioner did not establish that he would have accepted the plea under either test.  ECF No. 9 at 20.

While Petitioner's case was on collateral review in state court, the United States Supreme Court decided Missouri v. Frye and Lafler v.

Cooper, which applied the Strickland test in the factual context of failure to convey a plea offer. *See* In re Perez, 682 F.3d 930, 932-34 (11th Cir. 2012) (per curiam) (holding that Lafler and Frye do not announce new rules, but rather apply Strickland in the narrow context of failure to convey a plea offer). Under Frye and Lafler, a defendant is required to demonstrate a reasonable probability that (1) he would have accepted a plea offer but for counsel's ineffective assistance; (2) the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it; and (3) the plea would have resulted in a lesser charge or a lower sentence. *See* Frye, 566 U.S. at 147; Lafler, 566 U.S. at 164. Because Lafler and Frye merely construe Strickland in a new context rather than creating a new rule, the Strickland standard as construed in the context of the plea process is the "clearly established federal law" with which state court adjudications must comport.

This standard was first announced in Hill v. Lockhart, when the United States Supreme Court first applied Strickland in the context of pleas. 474 U.S. 52 (1985). The Court in Lockhart addressed not a failure to convey a plea, but a claim arising out of counsel's failure to advise the prisoner correctly as to his parole eligibility date. *Id.* at 54-55. The Court noted, however, that the Strickland standard "seems to us applicable to

ineffective-assistance claims arising out of the plea process." *Id.* at 57.

The Court further specified that the second prong of the Strickland analysis

"focuses on whether counsel's constitutionally ineffective performance

affected the outcome of the plea process." *Id.* at 59. Therefore, under the

Lockhart standard, as well as under the tests for Strickland prejudice set

forth in Frye and Lafler, the first question before the state courts is whether,

but for his counsel's deficient performance, there is a reasonable

probability that Petitioner would have accepted the plea offer.[11] The state

court record supports the trial court's determination that Petitioner failed to

meet this requirement.

The state courts' adjudications correctly applied the Strickland

standard, and are therefore not contrary to . . . clearly established federal

law. *See* Williams, 529 U.S. at 407. The state court also reasonably

concluded that Petitioner did not demonstrate a reasonable probability that,

but for counsel's deficient performance, Petitioner would have accepted the

plea deal. Contrary to Petitioner's characterization of the prosecutor's

questions as an "attempt to confuse" him and Petitioner's claim that he

---

[11] This element is also incorporated into both the Cottle and Alcorn tests. *See* Cottle, 733 So. 2d at 963 ("(2) defendant would have accepted the plea offer but for the inadequate notice"); Alcorn, 121 So. 3d at 430 ("(1) [defendant] would have accepted the offer had counsel advised the defendant correctly"). Because both tests are conjunctive, and require the prisoner to establish each element in order to prevail, the result in this case would be the same whether the state courts applied Cottle or Alcorn.

"clearly testified on each occasion asked that he would have taken the 20 year sentence," ECF No. 1 at 26-28, Petitioner gave plain answers to uncomplicated questions indicating the opposite. When Petitioner was asked how he would have answered if his counsel had asked him before trial what length of prison term he would like, Petitioner answered "Three years." Ex. O at 216. The prosecutor then asked, "So if he had then said, well, the offer is 20, what would you have said?" and Petitioner answered, "I want three." *Id.* at 216-17. The state court could reasonably have concluded that Petitioner failed to undermine confidence in the outcome, *c.f.* Strickland, 466 U.S. at 694; thus, the state court's conclusion that Petitioner could not satisfy the prejudice standard was reasonable. Therefore this Court should deny relief on Ground Five.

## Conclusion

Based on the foregoing, Petitioner Cipriano Gongora is not entitled to federal habeas relief. Accordingly, the section 2254 petition (ECF No. 1) should be **DENIED.**

## Certificate of Appealability

Rule 11(a) of the Rules Governing § 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the

applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make "a substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84 (2000) (explaining substantial showing). Therefore, the Court may deny a certificate of appealability.

Rule 11(a) also provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this Report and Recommendation. Leave to appeal in forma pauperis should also be denied. *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## <u>Recommendation</u>

Accordingly, it is respectfully **RECOMMENDED** that the section 2254 petition (ECF No. 1) be **DENIED**. It is also respectfully **RECOMMENDED**

that a certificate of appealability be **DENIED** and that leave to appeal in

forma pauperis be **DENIED**.

In chambers at Tallahassee, Florida on April 19, 2017.


**S/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of these objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. R. 3-1; 28 U.S.C. § 636.**